# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NUMBER 15-0057 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| EDUARDO GUERRERO | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. #s 41 and 49] filed by defendant, Eduardo Guerrero, alleging that the investigating officer was given insufficient consent to search by the operator of the vehicle, and that any consent was vitiated by the unduly long stop. He further alleged that the detection dog failed to provide discernible objective grounds for seizure and examination of the vehicle and its contents.

 The government opposed the motion, and, following an additional period for briefing and a February 2, 2016, evidentiary hearing, the matter is now before the court. For reasons stated below, it is recommended that the motion be DENIED.

## Relevant Testimony and Documentary Evidence

Two witnesses testified at the hearing – Trooper Stephenson and Trooper Linton. In addition, the government introduced eleven exhibits that the court accepted into evidence.

The court summarizes relevant testimony and evidence, as follows,

1.  On March 8, 2015, Louisiana State Trooper Justin Stephenson made a traffic stop at approximately 8:13 a.m. on Interstate 20 in Ouachita Parish. Trooper Stephenson is a dog handler on the criminal patrol team for the Louisiana State Police. He has been with the

Louisiana State Police since September 2010. Trooper Stephenson stopped the F150 pickup truck containing driver Raul Eduardo Tuda and passenger Tomas Gonzales for crossing the white fog line on two separate occasions. Trooper Stephenson made contact with Tuda and asked if he spoke any English. Tuda responded that he did not speak English and Trooper Stephenson proceeded to communicate to Tuda in broken Spanish. Trooper Stephenson is not fluent in Spanish and has had no formal training in Spanish. When trooper Stephenson asked Tuda for his driver's license, Tuda stated that he did not have a driver's license, but did provide Trooper Stephenson with a Texas ID card.

2.    Once Trooper Stephenson noticed the passenger in the F150, Gonzales, he asked for his driver's license and was presented with the passenger's Mexican ID. Trooper Stephenson asked Gonzales their destination and where they were coming from. Gonzales did not provide Trooper Stephenson with a destination and stated  first that they were coming from Juarez, Mexico and then from El Paso, Texas. Trooper Stephenson observed that the passenger appeared to be nervous. Gonzales handed Trooper Stephenson a Texas Department of Motor Vehicles registration, showing that the vehicle was registered to Eduardo Guerrero out of El Paso, Texas.

3.    While approaching the vehicle, Trooper Stephenson noticed unusual alterations to the truck. The exhaust pipe had been placed out over the rear axle instead of behind the rear axle. Trooper Stephenson observed that the modification had resulted in burn marks to the side of the truck from the exhaust. Upon further inspection by kneeling down to look underneath the truck, Trooper Stephenson could see that the muffler had been rerouted and turned. He also noticed a floor jack in the bed of the pickup.

4.    Trooper Stephenson again asked both occupants where they were traveling to and for what purpose. Gonzales said something that appeared to sound like Jackson to Trooper Stephenson. When Trooper Stephenson confirmed that he had said Jackson, Gonzales stated yes. Then Gonzales said they were traveling to Atlanta. Trooper Stephenson had Gonzales confirm that their destination was Atlanta, to which Gonzales again replied yes. Trooper Stephenson inquired if they were going to pick up a car, and Tuda responded yes.

5.    At this point, Trooper Stephenson had suspicions about the vehicle and the travel itinerary of the occupants. Trooper Stephenson based this opinion on the nervousness of both occupants, the fact that neither had a driver's license, the occupants could not affirmatively tell him their destination, the modifications to the exhaust of the vehicle, the jack in the bed of the truck and the fact that neither occupant was listed as a registrant on the vehicle.

6.    Trooper Stephenson then returned to his vehicle to conduct a warrants check on the occupants, write Tuda a citation for no driver's license, and to request that Trooper Michael Linton to come to his location for assistance. Trooper Michael Linton is a fourteen year veteran of the Louisiana State Police in Monroe. Trooper Linton is also a

part of the criminal patrol unit.

7.     Trooper Stephenson gave Tuda a citation for driving without a license, had Tuda sign the citation and returned the occupant's IDs to them at approximately 8:19 a. m. Trooper Stephenson then requested to search the vehicle and Tuda consented to the search orally and on a Louisiana Department of Public Safety Consent to Search form. The form was written in Spanish and Tuda appeared to understand the form and to sign it. However, the consent form was not logged into evidence and has not been recovered. Trooper Stephenson's report does not notate that oral or written consent was given. The dash cam video depicts Trooper Stephenson explaining the consent form to Tuda and then Tuda handing the consent form back after signing it, but because of the camera location, Tuda is mostly blocked from view by Stephenson's body while he actually signs the form.

8.     During Trooper Stephenson's search of the vehicle, he observed a new fuel filter on the truck that looked like it had been recently worked on. The truck was equipped with two fuel tanks, and the rear fuel tank appeared to have a square patch on the bottom of the tank that matched the jack in the bed of the truck. Upon closer inspection, he was able to determine that that the exhaust pipe had in fact been rerouted. Additionally, mud was observed underneath the truck that appeared out of place, while a screw that held the spare tire in place was not covered in the mud. Trooper Stephenson believed, according to his training, that the mud had been thrown underneath the vehicle in an attempt to disguise work done to the fuel tank.

9.     Trooper Stephenson noticed that the front fuel tank was leaking and ran a density meter to determine the density of the contents of the tank. The results were not unusual and were consistent with liquid in the tank. After thoroughly searching the vehicle, Trooper Stephenson suspected that there was contraband located in one of the two gas tanks.

10.    Trooper Stephenson is dog handler for the Louisiana State Police and has been with his drug detection dog, Senda, since September 2010. Before joining the Louisiana State Police, Trooper Stephenson was a dog trainer. In 1998, Trooper Stephenson went through a 13 week military working dog handlers course at Laughlin Air Force Base. From there Trooper Stephenson spent a year in Okinawa, Japan, as a bomb dog handler. From Japan, Trooper Stephenson spent two years in South Carolina as a trainer and kennel master. After South Carolina, Trooper Stephenson was stationed in Hawaii, where he was in charge of training and the upkeep of all dogs and all handlers. Trooper Stephenson has trained both drug and bomb detection dogs. His dog Senda has been certified by the National Police K-9 Association for marijuana, cocaine, methamphetamine and heroin. Senda had been certified on October 15, 2014, less than six months prior to the traffic stop of Tuda.

11.    Trooper Stephenson had Senda perform an open air sniff around the vehicle. Senda alerted on the driver's side near the fuel tank. Then Trooper Stephenson requested that the

vehicle be moved from the side of the road to the troop headquarters for further inspection. Tuda agreed, and drove the truck to the troop headquarters at approximately 8:43 a.m.

12.     Once at the headquarters, Trooper Stephenson used a fiberoptic scope to view the contents of the fuel tank and was able to see liquid inside. Trooper Stephenson noticed rust in the tank and in the neck of the tank. Trooper Stephenson noted that rust would not normally accumulate unless gas was not being continuously put in the tank.

13.     When Trooper Stephenson removed the fiberoptic scope, the liquid on the scope began to crystalize and then turn white. A field test was performed on the substance and the test came back positive for methamphetamine. Trooper Stephenson was then able to recover approximately 16 gallons of liquid methamphetamine.

**Law and Analysis**

### I.     The Stop and Detention

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A traffic stop entails a seizure for purposes of the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a vehicle and detaining its occupants constitutes a seizure). Traffic stops, whether supported by probable cause or a reasonable suspicion, are analyzed under the standard established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *Brigham, supra.* (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry*, 392 U.S. at 30). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). To satisfy the Fourth Amendment, the stopping officer must be able to

4

"articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)). The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances — the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

The *Terry* standard a is two-tiered inquiry: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001) (citing *Terry*, 392 U.S. at 19-20). Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

a)    *Terry's* First Prong

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

To the extent that Defendants challenge the propriety of the initial stop, their claim is without merit. Stephenson testified that he directly observed the vehicle Defendant Tuda was driving across the white fog line of I-20. A review of the dash cam video supports Trooper

Stephenson's testimony. The undersigned thus concludes that the traffic stop was justified at its inception.

>    b)    *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 F.3d at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about the purpose and itinerary of their trip, including other unrelated questions.[1] *See generally Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437.

Detention during these actions is reasonable under the Fourth Amendment; however, detention which occurs because of additional actions, particularly those taken after a police officer has verified that a driver is not subject to any warrants and that a vehicle is not stolen, may only be taken when there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime. *See United States v. Jones*, 234 F.3d 234, 241 (5th Cir.

---

[1] "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'" *Lopez-Moreno*, 420 F.3d at 431.

2000). "The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch." *Id.* (citing *Sokolow*, 490 U.S. at 7). When making a reasonable-suspicion determination, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[2] *United States v. Grant*, 349 F.3d 192, 197 (5th Cir. 2003) (quoting other sources). If reasonable suspicion appears during the course of the stop, and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. *See Lopez-Moreno*, 420 F.3d at 431 (5th Cir. 2005); *Brigham*, 382 F.3d at 507.

In this case, then, the question is whether Stephenson's actions after he legitimately stopped Defendant's vehicle were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion based on articulable facts developed during the stop. Trooper Stephenson's initial questioning of the driver was fully within the scope of the initial traffic stop. As cited above, the Fifth Circuit has repeatedly held that, pursuant to a valid stop, a police officer may request the driver's license and registration, run a license and criminal background check, and question the driver regarding her origin and itinerary. *See Dortch, supra*. Here, Trooper Stephenson testified that he asked the driver, Tuda, why he crossed the fog line and general questions about his travel itinerary. [doc. 43, p. 6]. These initial questions were related to the purpose and itinerary of Tuda's trip and were fully within the scope of the detention justified by the traffic stop. *See Brigham*, 382 F.3d at 507-08.

---

[2] The Fifth Circuit reiterated, however, that police need not "have 'particularized suspicion' based on essentially direct evidence of a particular specific crime in order to form the 'reasonable suspicion' needed to justify a detention." *United States v. Pack*, 612 F.3d 341, 356-57 (5th Cir. 2010).

Thereafter, Trooper Stephenson developed additional reasonable suspicion of criminal activity sufficient to extend the stop beyond the point of asking general questions. First, neither the driver nor the passenger had a proper driver's license. Second, during the course of Trooper Stephenson's initial questioning, the occupants seemed unusually nervous. Third, the vehicle was registered to a third party, Guerrero. Fourth, during the initial questioning of the occupants in the vehicle, neither occupant could give Trooper Stephenson a destination. Fifth, Trooper Stephenson noticed unusual modification to the exhaust of the vehicle.

The court must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). The courts are generally obliged to accord deference and even "great respect" to an officer's training and experience. *See United States v. Jenson*, 462 F.3d 399, 405 (5th Cir. 2006). Furthermore, the courts are prohibited from examining and rejecting individually each factor that the police cite as having created reasonable suspicion. *United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) (citation omitted). Thus, even if the facts articulated by the officer are individually consistent with innocent travel, taken together they may amount to reasonable suspicion. *Sokolow*, 490 U.S. at 9 (citations omitted); *Pack*, *supra*.

The cumulative effect of Trooper Stephenson's observations provided him with sufficient reasonable suspicion of criminal activity to extend the stop.  For this reason, the continued detention of the occupants was constitutional.

### III.    The Search

8

As discussed above, Trooper Stephenson testified that he asked the driver for permission to search Defendant's vehicle. When consent is considered to have validated a warrantless search, the court must examine "the totality of the circumstances to determine whether the consent was knowingly and voluntarily given." *United States v. Davis*, 749 F.2d 292, 294 (5th Cir. 1985). "The voluntariness of consent is a question of fact" that is reviewed for clear error. *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002).

A federal court "considers six factors in evaluating the voluntariness of consent to search, all of which are relevant, but no one of which is dispositive or controlling." *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005). Those six factors are: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Id.*

However, the Court must first determine whether Tuda, as the driver of the vehicle, had the proper authority to give consent to search Defendant Guerrero's vehicle. In *United States v. Crain*, the court held that the non-owner driver of an automobile has authority to consent to a search of that vehicle. 33 F.3d 480 (5th Cir. 1994). *Crain* reiterates the well-settled principle that a "person who has joint control over an automobile may give valid consent to its search." *Id.* at 484 (citing *United States v. Varona-Algos*, 819 F.2d 81, 83 (5th Cir. 1987) (driver's consent to search vehicle valid against passenger who later claimed to be vehicle's owner); *see also Johnson v. United States*, 358 F.2d 139, 140 (5th Cir. 1966) ("[t]he person in lawful possession of an automobile has authority to grant permission to search it."); *see United States v. Thomas*, 93 F.3d

479, 486 (8th Cir. 1996) ("A driver of an automobile has sufficient authority to give consent for its search.").

As such, the Court finds that Tuda, as the driver of the vehicle, did have at least joint possession over the vehicle, and therefore, had the authority to give consent to search Defendant Guerrero's vehicle. Further, the undersigned concludes that he gave a general consent to search the entire vehicle. Defendant argues that the Government has been unable to produce Tuda's signed written consent form. However, Trooper Stephenson testified and the dash cam video supports his testimony, that he gave Tuda a written consent form in Spanish which Tuda reviewed and signed.  This testimony is also verified by Trooper Linton, who is visible in the video, and who was in a position to see the signed consent form. While the government has been unable to produce the executed consent form, the Court finds that its omission from the record is not fatal to the government's proof that Tuda consented to the search. In addition, the video also supports Stephenson's claim that Tuda orally consented to the search.

This leaves the question of whether the driver Tuda's consent was knowingly and voluntarily given. As Trooper Stephenson testified, after having Tuda get out of the vehicle and questioning him, Trooper Stephenson asked to search the vehicle. Additionally, Trooper Stephenson had Tuda review and sign a Louisiana written consent form. Upon a review of the dash cam recording, Tuda appeared to read the consent form provided to him by the troopers, which specifically advised him, in Spanish, that he had the right to refuse to consent and that he could revoke his consent at any time. The dash cam video supports Stephenson's testimony that Tuda reviewed the consent form and signed it. The court finds that defendant was aware of his right to refuse and/or revoke consent to search.

10

A review of the recording also shows that, at all times, Trooper Stephenson conducted himself in a professional, yet friendly manner. He does not appear to raise his voice to the occupants of the vehicle or verbally or physically threaten them. There is no evidence of police misconduct or overreaching. Finally, given the well-hidden nature of the contraband that was finally discovered, even if Tuda was aware of its presence, he would have been reasonably comfortable that the search would not necessarily uncover it. Therefore, in conclusion, the Court finds that the government has proved that the driver Tuda's consent to the search of the vehicle was both knowing and voluntary.

### III. Deployment of K-9

Defendant argues that the deployment of the dog was inappropriate and failed to provide discernible objective grounds to justify a search of the vehicle. [doc. # 49, p. 16]. Defendant contends that the evidence should be suppressed on the basis that the purpose of the traffic stop had concluded, once Trooper Stephenson gave Tuda a citation. *Id.* Defendant avers that unlike traditional inquiries associated with traffic stops a dog sniff is a measure aimed at detective evidence of ordinary criminal wrongdoing, which the Supreme Court has expressly prohibited in other circumstances. *Id.* at 17 (citing *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). In short, Defendant argues that because the sniff search of the vehicle prolonged the traffic stop, any evidence obtained after the issuance of the traffic citation was obtained unlawfully. *Id.*

Again, given the reasonable suspicion developed by Stephenson during the stop, the valid consent to search, and the additional suspicion engendered by the findings of the consensual search by the troopers, the additional step of conducting a dog sniff search in no way violated the defendant's rights.

11

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 41] filed by defendant, Eduardo Guerrero be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 16th day of February 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

12